IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JIMMIE HINELY,

      Plaintiff,

v.

                              Civil Action No. 2:03-CV-31

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

```
+---------------------------+
|       ENTERED             |
|                           |
|      JAN 3 1 2005          |
|                           |
|   U.S. DISTRICT COURT     |
|    ELKINS, WV 26241       |
+---------------------------+
```

## REPORT AND RECOMMENDATION

      Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

      Jimmie Hinely ("Plaintiff") filed applications for DIB and SSI on May 28, 1998, alleging disability as of January 1, 1997, due to a ruptured disc, attention deficit disorder, and arthritis in his back, knees, elbows, fingers, and shoulders (R. 20).[1]  Plaintiff last met the insured status requirements of the Act on September 30, 1998, and therefore must establish that he was disabled

---

[1] The Application is not in the record.

prior to that date in order to be insured for DIB. 20 CFR § 404.101. The applications were denied initially and on reconsideration. Upon review, Administrative Law Judge ("ALJ") Karl Alexander remanded the claim to the State agency for consideration of Plaintiff's alleged mental impairments (R. 39). Upon further review, the State agency again denied Plaintiff's claim (R. 41). Plaintiff requested a hearing, which was held on October 30, 2001, by ALJ Edward J. Banas. Plaintiff, represented by counsel, testified, along with Medical Expert Ray Clark and Vocational Expert James Ganoe ("VE") (R. 747). The ALJ rendered a decision on March 6, 2001, finding Plaintiff was disabled as of June 1, 2000, but was not disabled at any time prior to that date (R. 24). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 9-10).

## II. Statement of Facts

Jimmie Hinely ("Plaintiff") was born on December 21, 1958, and was 42 years old at the time of the Administrative Hearing (R. 761). He has a tenth grade education and obtained his GED. His past relevant work experience includes work at a fish packing plant, in construction, as a mechanic, and as an equipment operator (R. 762-766). He had not worked since 1996.

In 1981, Plaintiff was admitted for in-patient psychiatric treatment (R. 100-102, 103-138, 142-145). He was noted to have a long history of explosive outbursts and self-destructive behavior. He reported decreased appetite, sleep disturbance, agitation, and suicidal ideation. His judgment and insight were considered to be poor. He was diagnosed with an adjustment disorder with depressed mood and personality disorder with mixed features.

In 1982, Plaintiff suffered a blunt injury to the right knee with complaints of locking and pain. He subsequently underwent a right knee arthroscopy for torn retropatellar cartilage with grade

2

II chondromalacia and torn cartilage of the femoral and medial tibial compartments (R. 155-172).

On April 1, 1996, plaintiff underwent surgical anterior reconstruction of the left shoulder (R. 452-5101). Plaintiff is left handed. The history of this surgery indicates that Plaintiff underwent an arthroscopic procedure on the same shoulder in February 1996, and had a subacromial impingement preoperatively, and that at the time of the arthroscopic debridement he was noted to have anterior subluxation and subacromial impingement. He underwent subacromial decompression and arthroscopic glenohumeral debridement. After exercise he reported no significant relief and a second surgery for reconstruction was necessary.

Plaintiff present to the ER on January 7, 1997, for a closed head injury, left shoulder contusion, hypertension, laceration above the left eye, and possible left orbit blow out fracture after reportedly falling (R. 185). Cervical spine x-rays showed an anomaly of the C6 vertebra which appeared to be consistent with a spina bifida occulta as well as hypoplasia of the spinous process (R. 413-515).

In October 1997, Plaintiff began psychiatric treatment with psychologists Battisti and Steward. His presenting problems were anxiety and depression. Axis I diagnoses included general anxiety disorder, adjustment disorder, R/O ADHD and R/O intermittent explosive disorder (R. 228).

Dr. Battisti referred Plaintiff to Dr. Blackwell for evaluation on October 13, 1997 (R. 569-570). Dr. Blackwell recorded Plaintiff's complaints as long-standing pain in the low back, numbness in the left foot at times, pain in the right elbow, worsening pain of the right knee, history of ADHD, ligamentous injury to both right and left knees, rotator cuff trauma of the left shoulder, and TMJ problems corrected surgically.

On October 21, 1997, Plaintiff saw orthopedist William Carson, M.D. for his complaints of

3

knee and elbow pain. X-ray showed joint space narrowing of both knees with weight bearing, and lateral epicondylitis of the right elbow.

Lumbar spine X-rays in November 1997, showed middle hypertrophic spurring involving the anterior aspect of L3-4 and L4-5 vertebral bodies (R. 614). MRI November 8, 1997 showed diffuse loss of disc hydration extending from L1-2 to L5-S1 with mild loss of disc height, an annular tear at the L4-5 and L5-S1 levels, and mild indentation of the thecal sac from the bulging disc extensively from L2-3 to L5-S1 (R. 615, 625).

A second MRI four days later showed multilevel bulging disc with dehydration, radial tear at L23-3, L4-5, and L5-S1, and small posteriocentral protrusion of the disc at the level of L5-S1, with obliteration of the anterior epidural fat with "what appears to be a small cyst in the left side of the body of the L2 vertebra" (R. 616-617).

The next day, Plaintiff presented to the ER with complaints of severe back pain (R. 640-641). He returned to Dr. Blackwell on November 19, 1997, complaining that his back was getting worse (R. 566-567).

Plaintiff was admitted to the hospital on December 18, 1997, for acute intractable back pain (R. 618-619). He reported having fallen again. The examining doctor reported that Plaintiff was severely histrionic and uncooperative with range of motion testing due to reported pain (R. 622). Straight leg raising was positive at only five to ten degrees. Sensation to light touch and pinprick was intact, equal and symmetrical. The doctor noted questionable malingering. Plaintiff was admitted and treated with Demerol overnight. He was evaluated by physical therapy and was found to have pain out of proportion to his physical examination (R. 619). He was able to sit, stand and walk a few steps with much histrionic, but with no difficulty moving. He was discharged with a

4

diagnosis of acute low back secondary to reinjury with histrionic overlay and chronic back pain history. The admitting physician noted:

> Patient showed a lot of histrionics during the exam with multiple complaints of back and leg pain during his lower extremity exam . . .

It was felt Plaintiff's pain was out of proportion to the physical findings.

By referral from Dr. Blackwell, Plaintiff was evaluated by Dr. Tamea on January 21, 1998 (R. 536, 562-563). Dr. Tamea opined that Plaintiff suffered "significant back disability" and recommended physical therapy and nonsteroidal medications. He did not feel that Plaintiff was a candidate for surgery.

Dr. Blackwell's office notes of February 2, 1998, indicate Plaintiff reported having fallen after his appointment with Dr. Tamea, and that he had experienced several episodes of numbness and anesthesia to the lower extremities, predominantly the left, followed by parasthesia (R. 561). Dr. Blackwell noted discoloration of the left toes and lower extremity. On February 16, 1998, Plaintiff again reported falling episodes. Dr. Blackwell again noted areas of inflammation on Plaintiff's forehead indicative of trauma (R. 560).

EMG and Nerve Conduction Studies of the lower extremities were "consistent with acute L5-S1 radiculopathy, most likely due to ruptured disc" (R. 557-558). A neurosurgical consult was recommended. Plaintiff was seen for a consultative examination by Dr. C. Y. Amores (R. 533-535). Dr. Amores noted that the examination was difficult because Plaintiff reported every move hurt his back (R. 535). An MRI revealed a diffuse bulge and annular tear at L4-5 and L5-S1. Dr. Amores concluded that Plaintiff had "significant, chronic low back pain that goes down both legs without any neurological deficit." He recommended conservative treatment.

A second neurological evaluation in June 1998, showed normal 5/5 strength throughout (R.

531). Plaintiff reported diffuse bilateral lower extremity parasthesia. An EMH was consistent with a bilateral L5-S1 radiculopathy. An MRI had shown a small central disc bulge at L4-5 without any nerve root impingement. The clinical impression was low back pain without any evidence of radiculopathy (R. 532)

Plaintiff saw Dr. Blackwell regularly for his back pain through July 1998. He continued to complaint about his legs going out on him and falling. He also presented to the ER in March and May of 1998, with complaints of severe, chronic back pain. Beginning May 5, 1998, Dr. Blackwell's diagnoses also included anxiety and depression , hearing loss, R/O hypertension, and dyspepsia.

On May 19, 1998, Plaintiff reported having injured his right wrist in a fall (R. 541). X-rays showed possible ulnar styloid fracture and definite injury to the triangular fibrocartilage complex. His wrist was casted. A week later, Plaintiff again reported falling due to numbness in his legs (R. 551-552). He had broken his wrist cast in this fall.

Plaintiff continued to complain of low back pain, lower leg pain, numbness and give away weakness of the legs through June 1998 (R. 546-551). He reported another fall with injury to his left shoulder on June 29, 1998 (R. 545).

On July 13, 1998, Plaintiff reported increasing anxiety and headaches (R. 543-544).

Plaintiff was referred to Dr. Amar for his dyspepsia (R. 594). Dr. Amar interpreted Plaintiff's EGD as showing Barrett's disease, moderately severe gastritis, a small hiatal hernia, mild duodenitis and hypertrophied Brunner's glands (R. 594). These diagnoses were confirmed by pathology (R. 580-581, 595-596).

Plaintiff was referred to Dr. Deer at the Center for Pain Relief in August 1998. Dr. Deer subsequently referred him to Dr. Silk and Dr. Gutmann, a neurosurgeon, for evaluation (R. 578). That same month, Plaintiff began seeing Dr. Milan as his family doctor (R. 541-542). Plaintiff

continued to report fall due to giveaway weakness in his legs. He also began complaining of loss of bowel and bladder control.

Dr. Silk examined Plaintiff and diagnosed lumbar spondylosis. He recommended a myelogram.

Plaintiff presented to the ER on October 13, 1998, after falling due to his legs "giving way" (R. 599, 610-613). X-ray of the lumbar spine showed lumbar spondylosis, unchanged from 11/8/97 (R. 645). A CT scan showed Schmorl's node and/or degenerative changes of the superior end plate of the body of L2 (R. 644).

Plaintiff presented to the ER again on November 7, 1998, for complaints of acute exacerbation of back pain. X-rays indicated a mild degree of degenerative changes of L2-3 and L3-4 with small anterior osteophytes (R. 217, 600-603).

Dr. Gutmann saw Plaintiff on December 1, 1998. Upon examination, strength muscle tone, and coordination were normal (R. 654). Plaintiff walked with a slow, antalgic gait. Upon examination, Dr. Gutmann noted an absent left ankle jerk. She also noted that the sensory exam was difficult to interpret, with some questionable decrease in vibratory sensation to the knees bilaterally and unreliable proprioception testing. She noted Plaintiff had decreased pinprick sensation below the knees bilaterally (R. 654, 661, 665). He had a positive Lhermitte's Sign.[2] She recommended an MRI of the cervical spine, but noted this would not explain the severe low back pain.

Charles Paroda, D.O. examined Plaintiff for the State agency on December 2, 1998 (R. 670-

---

[2]The development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 1700 (30th ed. 2003).

678).  He noted  Plaintiff showed joint discomfort with range of motion that appeared to be out of

proportion to the physical findings (R. 675).  He also noted that Plaintiff acted like he was going to

fall several times, but would catch himself and not fall.  Instead he "kind of stumbled" (R. 675).

There was no evidence of any muscle atrophy or wasting.  Muscle tone was excellent throughout.

He also had excellent strength bilaterally and complaints of severe pain in his legs and back were

out of proportion to the physical findings (R. 675).  Plaintiff walked with a cane, but Dr. Paroda

could not detect a gait defect.  Plaintiff was able to stand on one leg and walk heel-to-toe, but

complained of pain and weakness in his legs.  Deep tendon reflexes were normal.  Dr. Paroda

summarized the examination as follows:

> Overall, except for his complaints of muscle aches and pain and the
> myalgia/arthralgias, the remainder of the exam was within normal limits.  I'm not
> exactly sure what type of problems this patient truly has physically.  He does
> complain of having some attention deficit hyperactivity disorder and he has an
> evaluation scheduled for that.  Some of his physical problems may have an
> underlying psychological base.

(R. 676).

Plaintiff underwent a psychological battery of tests with Dr. Battisti on December 4-7 1998

(R. 219-227).  Dr. Battisti noted Plaintiff's anxiety level was somewhat higher than appropriate.  His

mood was dysphoric, there were some difficulties in immediate memory and attention and

concentration, and some motor problems were exhibited.  Axis I diagnoses were pain disorder, mood

disorder due to major depressive-like episode, anxiety disorder, R/O undifferentiated somatoform

disorder, and R/O ADHD.  Axis II diagnoses included personality disorder, NOS and R/O schizoid

personality disorder.  Dr. Battisti completed a Mental RFC (R. 689-692),  finding Plaintiff

moderately limited in his ability to maintain attention and concentration for extended periods;

perform activities within a schedule; maintain regular attendance and be punctual within customary

8

tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal work day and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently of others.

Dr. Battisti also complete at Psychiatric Review Technique ("PRT") form, opining Plaintiff met the "A" criteria of Listings 12.02, 12.04, 12.06, and 12.08 (R. 693-701). He found moderate limitations in activities of daily living, social functioning and concentration, persistence or pace, and opined Plaintiff would once or twice experience episodes of deterioration and decompensation in a work-like setting.

In January 1999, Plaintiff underwent a cervical MRI which showed diffuse bulging at the C3-4 level with effacement of the subarachnoid space (R. 650-651). Dr. Gutmann did not believe this could account for Plaintiff's symptoms of back pain, neck pain and multiple symptoms. She also ruled out multiple sclerosis. Based upon the MRI with no evidence of multiple sclerosis, Dr. Gutmann referred Plaintiff back to Dr. Deer for pain management (R. 647-648).

In February 1999, Plaintiff again underwent an MRI of the lumbar spine (R. 213). It showed minimal degenerative disc disease at multiple levels with loss of disc hydration and small posterior annular tear at the L4-5 level.

Plaintiff saw his family physician Dr. Milan six times in January and February 1999, and presented to the ER at least three times between January and July 1999, for falls with accompanying injury (R. 207-210, 203-205, 199-201).

On July 15, 1999, Cardinal Psychological Services, where Dr. Battisti practiced, indicated that Plaintiff was seen there fairy regularly between October 6, 1997, and March 17, 1999 (R. 218).

The office refused to submit the handwritten reports of Plaintiff's office visits as per its policy, but did state that as of his last visit, Plaintiff continued to exhibit depression, anxiety and pain related symptoms.

On May 19, 2000, Dr. Cameron completed a second psychological assessment, diagnosing major depressive disorder and generalized anxiety disorder.

Plaintiff's treating psychiatrist, Dr. Iyer, produced a Mental RFC dated August 13, 1999, finding Plaintiff moderately limited in his ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal work day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others (R. 240-243). Dr. Iyer also completed a Medical Assessment of Ability to do Work-Related Activities assessment form indicating Plaintiff's ability to deal with work stresses would be poor (R. 244-255).

Dr. Iyer completed a second RFC in April 2000 which is essentially the same as the above.

In December 1999, Plaintiff was again referred to Dr. Carson for complaints of right knee pain (R. 260). X-rays showed mild early stress and degenerative changes. Dr. Carson opined that Plaintiff should continue to use a cane in his left hand.

In October 1999, Plaintiff began seeing Dr. Antoine Katiny, M.D. (R. 250-251). Dr. Katiny referred Plaintiff to neurologist J. Weinstein, M.D. for evaluation (R. 249). Examination revealed negative straight leg raising and no obvious weakness in the extremities. Dr. Weinstein could not

10

account for Plaintiff's symptoms and indicated that the MRI showed only minimal disc disease. He advised Plaintiff to strengthen his back with exercise. An x-ray of Plaintiff's knee was normal.

Dr. Katiny was considering fibromyalgia as a diagnosis, and referred Plaintiff to Dr. Pfister at Charleston Area Medical Center ("CAMC"). Dr. Pfister noted decreased left ankle jerk, not sustained clonus right side ankle, and tenderness over both quads, the SI area, both trapezius and lower scapulars, and epicondyle. He also noted left rotator cuff impingement to mild degree. An MRI of the lumbar spine showed disc bulge with associated osteophytic spurs at L2-3 and L3-4. Dr. Pfister opined that Plaintiff was "fibromyalgic," plus had an element of degenerative disc on the left side (R. 314-315).

In January 2000, Dr. Katiny opined that Plaintiff could work only part time at the sedentary level (R. 264).

EMG and nerve conduction studies on February 24, 2000, indicated bilateral carpal tunnel syndrome of the upper extremities and moderate to severe peripheral neuropathy, sensory and motor of the lower extremities (R. 317). The carpal tunnel syndrome was treated conservatively with bilateral wrist braces, without success. In May 2000, Plaintiff underwent surgical release of the left wrist (R. 336-338).

A consultative examination by A. Sabio, M.D., revealed normal fine manipulative movements, normal sensory and motor function, and normal deep tendon reflexes (R. 257). Plaintiff's knees had tenderness, but full range of motion and no effusion. There was no ligamentous laxity (R. 255). There was no redness, heat or swelling. The shoulders, elbows, wrists and hands had no tenderness, redness or swelling. Dr. Sabio diagnosed degenerative arthritis of the lumbar spine and degenerative disc disease.

11

Throughout 2000, Plaintiff continued to treat with Dr. Katiny, to whom he continued to report back pain, left shoulder pain, bilateral wrist pain, neck pain, and radiculopathy and numbness of both legs, among others.  A November 2000 MRI showed herniation at the C3-4 level (R. 350).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits only through September 30, 1998.

2. The claimant has not engaged in substantial gainful activity since his alleged onset of disability date.

3. The claimant's back pathology, attention deficit disorder, affective disorder, anxiety disorder, and somatoform disorder are severe impairments based upon the requirements in the Regulations (20 CFR §§ 404.1521 and 416.921).

4. No medically determinable impairment meets or medically equals one of the listed impairment in Appendix 1, Subpart P, regulation No. 4.

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527 and 416.927).

7. From his alleged disability onset date until June 1, 2000, the claimant had the residual functional capacity to perform sedentary work that allows him to use a cane for balance.  He is limited to simple, routine, repetative [sic] jobs.  He should not have extensive contact with the public.  As of June 1, 2000, the claimant had a marked inability to maintain attention and a marked inability to maintain a work schedule.

8. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1545 and 416.965).

9. At 42 years of age the claimant is a younger individual.

10.    The claimant has attained a high school GED.

11.    The claimant has no transferable work skills.

12.    If the claimant could perform the full range of sedentary work, Rule 201.28 would apply to the claimant and direct a finding of not disabled.

13.    Using Rule 201.28 as a decisional frame of reference, jobs existed in the national and regional economies, from January 1, 1997, until June 1, 2000, which the claimant could perform with his limitation to less than a full range of sedentary work. Examples include dispatcher and security monitor.

14.    As of June 1, 2000, there were no jobs in the national and regional economies which the claimant could perform.

15.    The claimant became disabled and eligible for Supplemental Security Income Benefits on June 1, 2000. Prior to June 1, 2000, the claimant was not disabled.

(R.24-25).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit

has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ's finding that Plaintiff was not disabled prior to June 1, 2000 is not supported by substantial evidence:

    A. The ALJ misinterpreted the testimony of the medical expert, Dr. Clark;

    B. The testimony of the VE does not support the jobs which the ALJ identified as jobs Plaintiff could perform on a sustained basis prior to June 1, 2000; and

    C. The ALJ's hypothetical question propounded to the VE was incomplete and inadequate because:

        i. The ALJ did not identify all "severe" impairments at the beginning of the sequential process and did not include for the VE's consideration all exertional and nonexertional limitations documented in the record;

        ii. Because the ALJ failed to recognize a number of impairments which are clearly "severe," the foregone conclusion is that he failed to consider the combined effect of the "severe" and "nonsevere" impairments which rendering his decision that Plaintiff retained the residual functional for employment for the time period January 1, 1997 through June 1, 2000 [sic];

        iii. The ALJ's finding that Plaintiff, as a younger individual, retained a residual functional capacity for less than full range of sedentary activity signifies significant restriction, combined with the mental impairments, to render Plaintiff "disabled;" and

2.    The ALJ did not follow the two step sequential process for evaluating the issues of pain and credibility mandated by SSR 96-7p.

The Commissioner contends:

1.    Substantial evidence supports the Commissioner's decision that Plaintiff retained the RFC to perform sedentary work prior to June 1, 2000.

   A.    According to Dr. Clark, treatment notes from Dr. Iyer indicated a marked inability to maintain attention and marked inability to maintain a work schedule, beginning in June 2000 (R. 806). Thus, substantial evidence supports the ALJ's decision that Plaintiff was not disabled; and

   B.    The ALJ accounted for all of Plaintiff's severe impairments in the hypothetical question posed to the VE.

### C. Dr. Clark's Testimony

Plaintiff first argues that the ALJ misinterpreted the Medical Expert, Dr. Clark's testimony. Dr. Clark testified that he had reviewed the record, and considered mental Listing 12.02 for attention deficit hyperactivity disorder, 12.04 for affective disorder, 12.06 for anxiety disorder, and 12.07 for somatoform disorder --, specifically pain disorder (R. 802). He found that Plaintiff met the "A" criteria for all these impairments. As to the "B" criteria, he testified that Plaintiff experienced a mild to moderate degree of limitation in activities of daily living; a mild to moderate degree of limitation in social functioning; a moderate degree of difficulty in concentration, persistence and pace; and had experienced one or two episodes of deterioration in a worklike setting. He therefore found Plaintiff did not meet any mental impairment Listing. He testified he considered Exhibits B30-F, B22-F, B19-F, B12-F, and B10F. The ALJ asked Dr. Clark if he had specifically considered the RFC in Exhibit B30-F, and Dr. Clark responded that he had. He testified that most of the limitations found by Dr. Iyer were in the slightly limited to moderately limited range, with the exception of two – a marked degree of limitation with regard to understanding detailed instructions, and a marked degree

15

of limitation with regard to maintaining attention for long periods of time (R. 804). He then testified

that, although Dr. Iyer did not consider the issue, the profile suggested by Dr. Iyer's form indicated

"there may be times when Mr. Hinely's psychological difficulties may interfere with the normal

work week" (R. 805). The ALJ then asked Dr. Clark whether these limitations were documented

all the way back to January 1997. Dr. Clark testified that the first mental impairment diagnosis was

not made until October 1997, and that there was a span of undocumented mental condition in terms

of diagnoses from December 1998 until June 2000 (R. 805-806). He then testified:

> So, really, the majority of my opinion is based on a time period from October '97
> through December '98, and then what looks like from June of 2000 through I guess
> this most recent one, which was, what January of 2001. So we're really looking at
> just slivers of time in terms of documentation.

(R. 806-807).

Exhibit B30-F is an RFC completed by Plaintiff's treating psychiatrist, Dr. Iyer on January

10, 2001 (R. 352). He opined Plaintiff would be markedly limited in his ability to understand and

remember detailed instructions and his ability to maintain attention for extended periods (R. 352).

These are the limitations about which the ALJ asked the ME, and that the ME considered in

testifying Plaintiff might have difficulties that would interfere with a normal workday and

workweek. Significantly, however, Dr. Iyer also completed an RFC in April 2000, in which he did

not find Plaintiff markedly limited in any area whatsoever (R. 305-307). Dr. Iyer completed a third

RFC in August 1999, again finding Plaintiff had no marked limitations whatsoever (R. 240-242).

Further, on March 23, 2000, examining psychologist Dale Rice performed a battery of tests

and opined Plaintiff's concentration, persistence and pace were all normal (R. 282). His attention

span and concentration were good (R. 281). Dr. Rice diagnosed only a mood disorder NOS.

In March 2000, State agency reviewing psychiatrist Frank Roman opined Plaintiff did not

16

even have a severe mental impairment (R. 283), and his limitations from a mental impairment, if any, would be at most "slight."

Dr. Clark expressly referred to the "marked" impairments in Dr. Iyer's RFC of January 2001 in forming his opinion. Those marked impairments were not found by the same treating physician on prior occasions. The undersigned therefore finds substantial evidence supports the ALJ's determination, based on Dr. Clark's testimony, that Plaintiff's mental impairments "rose to a more severe level" as of June 1, 2000, and that they were not disabling before that date.[3]

### D. Hypothetical to the VE and VE Testimony

Plaintiff next argues the testimony of the VE does not support the jobs which the ALJ identified as jobs Plaintiff could perform on a sustained basis prior to June 1, 2000. Further, the ALJ's hypothetical question propounded to the VE was incomplete and inadequate because: 1) The ALJ did not identify all "severe" impairments at the beginning of the sequential process and did not include for the VE's consideration all exertional and nonexertional limitations documented in the record; 2) Because the ALJ failed to recognize a number of impairments which are clearly "severe," the foregone conclusion is that he failed to consider the combined effect of the "severe" and "nonsevere" impairments which rendering his decision that Plaintiff retained the residual functional for employment for the time period January 1, 1997 through June 1, 2000 [sic]; and 3) The ALJ's finding that Plaintiff, as a younger individual, retained a residual functional capacity for less than full range of sedentary activity signifies significant restriction, combined with the mental impairments, to render Plaintiff disabled.

---

[3]The undersigned notes the RFC in question was dated January 10, 2001, not June 1, 2000, but the ALJ apparently gave Plaintiff the benefit of the doubt on this issue, as Dr. Iyer's office notes attached to the RFC Exhibit begin with June 21, 2000.

## 1. Severe Impairments

The ALJ found Plaintiff had severe "back pathology," attention deficit disorder, affective disorder, anxiety disorder, and somatoform disorder (R. 24). Plaintiff first alleges that the phrase "back pathology" does not take into account his "documented HNP of the cervical spine, DDD with osteophyte formation of the lumbar spine, annular tear in the lumbar spine, congenital spina bifida occulta, and disc dessication and dehydration of the lumbar spine, all of which are severe and separate diagnoses. The undersigned finds, however, that the ALJ did discuss all of these findings, and that, therefore, his referring to all of Plaintiff's back impairments collectively as "back pathology" is not reversible error.

Plaintiff next argues that the ALJ erred by not including his knee impairments, shoulder impairment, carpal tunnel syndrome, and lower extremity neuropathy as severe impairments. "'[A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984) (*quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980) (emphasis added). A review of the Decision shows that, while the ALJ mentioned these impairments, he did not discuss whether or not they were severe and why. For example, regarding the carpal tunnel syndrome, the ALJ merely states: "In April 2000 the claimant began of complaining on pain in his wrists" [sic] (R. 22). There is no further discussion of carpal tunnel syndrome despite the fact that Plaintiff was diagnosed with bilateral carpal tunnel syndrome via EMG and nerve conduction studies (R. 317). Neurologist Derakhshan concluded from the test results that Plaintiff had bilateral carpal tunnel compression, more intense on the right, and also had

18

moderate to severe peripheral neuropathy, sensory and motor, of the lower extremities (R. 317).

Plaintiff underwent surgery on his left wrist for carpal tunnel syndrome, but apparently had not

undergone surgery on his right wrist, which the neurologist had found was worse. This is significant

in that Plaintiff used a cane in his left hand. Yet the ALJ did not address this impairment or the

lower extremity neuropathy. Neither did he discuss Plaintiff's alleged shoulder or knee impairments

except to note his arthroscopic surgeries. The Fourth Circuit stated in *Gordon v. Schweiker*, 725

F.2d 231 (4th Cir. 1984):

> We cannot determine if findings are supported by substantial evidence unless the
> Secretary explicitly indicates the weight given to all of the relevant evidence. *See,*
> *e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano*, 596
> F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.
> 1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the
> substantial evidence test when the Secretary has not considered all relevant evidence.
> Unless the Secretary has analyzed all the evidence and has sufficiently explained the
> weight he has given to obviously probative exhibits, to say that his decision is
> supported by substantial evidence approaches an abdication of the court's "duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the
> weight given to the various medical reports submitted by the appellant. We therefore
> remand to the district court with instructions further to remand the case to the
> Secretary with directions to the Secretary to reconsider the case and to indicate
> explicitly the weight accorded to the various medical reports in the record.

Because the ALJ did not explain his reasoning in not finding Plaintiff's shoulder and knee

impairments, carpal tunnel syndrome or lower extremity neuropathy severe, the undersigned cannot

find that substantial evidence supports his decision.

Further, because the undersigned finds substantial evidence does not support the ALJ's

determination that the above impairments were non-severe, it follows that substantial evidence also

does not support the ALJ's RFC or his hypothetical to the VE. At the fifth step of the evaluation,

"the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national

economy that the claimant can perform given his age, education, and work experience." *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir.1993) (*citing Walker v. Bowen,* 876 F.2d 1097, 1100 (4th Cir.1989)). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir. 1993).

In his RFC and resulting hypothetical to the VE, the ALJ limited Plaintiff to work at the sedentary exertional level which would allow him to use a cane for balance, and which would entail only simple, routine, repetitive jobs with no extensive public contact (R. 24). In response, the VE named occupations which existed in significant numbers in the local and national economy.

Because the ALJ did not fully discuss Plaintiff's shoulder, knee, wrist, and lower extremity impairments, the undersigned cannot find that substantial evidence supports his RFC assessment or his hypothetical to the VE.

20

## F. Credibility

Plaintiff next argues the ALJ did not follow the two step sequential process for evaluating the issues of pain and credibility mandated by SSR 96-7p. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594. Here, the ALJ's total credibility analysis is as follows:

21

I do not find the claimant's testimony to be particularly credible. His complaints are far in excess of those which would be expected to arise from an individual with physical impairments manifesting such modest objective findings. Physicians have often been puzzled by the claimant's complaints and additional testing has revealed little or nothing in the way of objective clinical findings.

(R. 23). The undersigned finds the ALJ did not expressly make the threshold finding that Plaintiff did or did not have medically determinable impairments which could reasonably be expected to cause the pain Plaintiff alleges he suffers. Instead, he "proceeded directly to considering the credibility of [Plaintiff's] subjective allegations of pain." *Craig, supra,* at 596. Further, the undersigned also finds the ALJ did not take into account all of the factors to be considered at the second step of the credibility analysis under *Craig*. His analysis at step two of the credibility evaluation is therefore also insufficient.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not particularly credible.

## V. Recommended Decision

For the reasons above stated, I find that substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend that Defendant's Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED IN PART**, by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition, and that this action be **RETIRED** from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the

22

Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Robert E. Maxwell, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984),

*cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*,

474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and

Recommendation to counsel of record.

Respectfully submitted this _31_ day of January, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE